IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

| | | |
|---|---|---|
| MICHAEL A. BAKER, PRO SE, | § | |
| also known as MICHAEL ALLEN BAKER, | § | |
| also known as MIKE BAKER, | § | |
| TDCJ-CID No. 1654093, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:12-CV-0080 |
| | § | |
| KIMBERLY FISK, P.A., | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**

This case was originally filed in the United States District Court for the Southern District of Texas, Houston Division. Plaintiff's claims against defendant KIMBERLY FISK, P.A., were severed and transferred by the United States District Court for the Southern District to this Court by transfer order of April 4, 2012.

Plaintiff MICHAEL A. BAKER, acting *pro se* and while a prisoner confined in the Texas Department of Criminal Justice, Institutional Division, sues defendant FISK pursuant to Title 42, United States Code, Section 1983. He has been granted permission to proceed *in forma pauperis*.

Plaintiff claims defendant FISK was deliberately indifferent to his serious medical needs by preventing plaintiff from seeing a qualified physician when plaintiff's neurological facial injury progressed into permanent disfigurement. Plaintiff states he now lives with chronic pain, facial numbness and disfigurement.

Plaintiff requests an award of $500,000.00 in compensatory damages against defendant FISK for physical, emotional and psychological injuries resulting from her failure to provide

adequate medical care, and $100,000.00 in punitive damages. He also seeks injunctive relief that he immediately be seen and examined by an independent freeworld (nonprison) doctor. He seeks his costs in this suit.

On September 21, 2012, the Texas Attorney General, acting as *Amicus Curiae* and in response to an order of the Court, submitted a *Martinez*[1] Report concerning plaintiff's claims. Plaintiff filed his response on November 2, 2012.

## JUDICIAL REVIEW

When a prisoner seeks redress from a governmental entity or from an officer or employee of a governmental entity, the Court must evaluate the complaint and dismiss it without service of process, *Ali v. Higgs*, 892 F.2d 438, 440 (5th Cir. 1990), if it is frivolous[2], malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. 1915A; 28 U.S.C. 1915(e)(2). The same standards will support dismissal of a suit brought under any federal law by a prisoner confined in any jail, prison, or other correctional facility, where such suit concerns prison conditions. 42 U.S.C. 1997e(c)(1). A *Spears* hearing need not be conducted for every *pro se* complaint. *Wilson v. Barrientos*, 926 F.2d 480, 483 n.4 (5th Cir. 1991)[3].

---

[1] *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978).

[2] A claim is frivolous if it lacks an arguable basis in law or in fact, *Booker v. Koonce*, 2 F.3d 114, 115 (5th Cir. 1993); *see, Denton v. Hernandez*, 504 U.S. 25, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992).

[3] *Cf, Green v. McKaskle*, 788 F.2d 1116, 1120 (5th Cir. 1986) ("Of course, our discussion of *Spears* should not be interpreted to mean that all or even most prisoner claims require or deserve a *Spears* hearing. A district court should be able to dismiss as frivolous a significant number of prisoner suits on the complaint alone or the complaint together with the *Watson* questionnaire.").

The Magistrate Judge has reviewed plaintiff's pleadings, the *Martinez* report, and plaintiff's response to determine if his claims should proceed further or whether they are subject to dismissal.

### MEDICAL RECORDS

Plaintiff states he was assaulted by another inmate on January 4, 2011 while at the TDCJ Holliday Unit and was placed into a transient holding cell. Plaintiff says he was later discovered unconscious and was taken to a local hospital where he was examined and treated. Plaintiff says he was then transferred to the Dalhart Unit and was eventually examined by a physician at the Byrd Unit while en route to the Dalhart Unit. Plaintiff alleges the physician, a Dr. Valdenebro, opined it was too early to tell if there would be any permanent nerve damage from the assault and advised plaintiff to submit a sick call request when he arrived at his new unit of assignment. Plaintiff says he did submit such a request at the Dalhart Unit and saw defendant FISK, P.A., but that she responded with deliberate indifference to his serious medical need and refused to allow him to see a qualified physician.

Plaintiff's contentions in this lawsuit involve claims that TDCJ places an unconstitutional degree of reliance on non-physician medical staff and has implemented a policy of delay and denial of access to qualified medical staff who could exercise judgment concerning non-emergency medical needs, like his neurological injury.

Plaintiff's TDCJ medical records show that, on January 4, 2011, at 10:35 a.m., he was brought to the Clinic ER at the Holliday Unit after a fist fight which occurred about 6:00 a.m. that day. Plaintiff lost consciousness for about 20 minutes after the incident. He was seen by a Physician's Assistant, or P.A., and an X-ray was ordered. Wet reading of the X-ray showed

plaintiff was seemingly okay. [MR[4] at 8]. On examination, plaintiff's gait was normal, he was oriented as to date, time, and place, he had a memory gap after the incident, and left eye peri-occular ecchymosis, commonly called a black eye. Plaintiff's neck and cerebellum appeared to be okay. There was a small superficial 2.0 cm cut on the left side temp-parietal area, no active bleeding. Plaintiff's mentation was intact. The diagnosis was head trauma with loss of consciousness. No skull area fractures. [MR at 8].

The treatment plan was to have neurological checks, give plaintiff IV fluids, NPO[5], and send him to the local hospital ER for a full evaluation. [MR at 8].

Plaintiff was later transferred to the Huntsville Memorial Hospital and two CT scans without contrast, one of plaintiff's facial bones and one of his brain, were conducted. [MR at 51-52] The CT scan of plaintiff's facial bones showed no evidence of any facial bone fracture. [MR at 51] The CT examination of plaintiff's brain showed "[u]nremarkable unenhanced CT examination of the brain without evidence of acute hemorrhage, acute infarction, mass or skull fracture." [MR at 52] The Huntsville Memorial Hospital physician diagnosed and treated plaintiff for a contusion (a bruise with swelling and some bleeding under the skin) and a scalp laceration which required staples. [MR at 28-29] Plaintiff was prescribed Ibuprofen for pain.

Plaintiff also suffered a loose cap on a tooth as a result of the altercation. [MR at 20]

Plaintiff states he was seen by P.A. Curry at the Byrd Unit on January 13, 2011 and was informed an appointment would be scheduled with the doctor and with the dentist. Plaintiff says he saw the Byrd Unit physician, Dr. Valdenebro, on January 20, 2011 and was told it was too

---

[4]Hereinafter, "MR" shall refer to the *Martinez* Report records submitted with the Amicus Curiae September 21, 2012 *Martinez* Report.

[5]NPO means "nil per os" or nothing by mouth and is an instruction to withhold food and water. See http://www.medilexicon.com/medicaldictionary.php?t=61224, viewed February 4, 2014.

early to tell if there would be any permanent nerve damage.  Plaintiff was instructed to submit a sick call request in about three weeks at his next unit.

While plaintiff's medical records produced with the *Martinez* Report do not reflect the alleged January 20, 2011 visit with Dr. Valdenebro, they do show plaintiff was examined on January 20, 2011 by a P.A. Curry.  P.A. Curry diagnosed plaintiff as status post closed head injury without residual neurological deficits.  His treatment plan was to follow up as needed.  [MR at 7]  This conflict is not critical and the Court accepts plaintiff's version as true.

Plaintiff's records while at the Dalhart Unit include nine sick call requests which were submitted while he was there.  Two of those sick call requests concern his glasses [MR at 38, 45], two concern his ears [[MR at 39, 43], two concern his diet [MR at 44, 46], and three dated May 4, May 9, and May 12, 2011 concern complaints of left side facial twitch, numbness and pain stemming from the assault [MR at 40-42].

The medical records also show plaintiff was seen by defendant FISK twice.  Defendant FISK saw plaintiff on February 10, 2011 for to a request to be placed on a diet due to previous gastric bypass surgery.  His vital signs were taken and she facilitated his request, prescribing a "diet for health" for one year.  [MR at 6] Although it is not reflected in the medical record, plaintiff says at this time he also told P.A. FISK of chronic severe pain, numbness, and involuntary facial twitch from his facial injuries and repeated to her that it was worsening and was affecting his quality of life.  Plaintiff says defendant FISK responded to his request to see a physician by informing him no physician was assigned to the Dalhart Unit and that nerve damage is untreatable, except to burn the nerve, which would risk facial disfigurement.  He said she also referenced budget cuts and said his injury was not a high priority.

Plaintiff then submitted a series of three sick calls, which he referred to as a gate-keeping protocol that was required before he could see defendant FISK again. He submitted these sick call requests on May 4, May 9, and May 12, 2011. On May 19, 2011, plaintiff saw defendant FISK for complaints of persistent left-sided facial pain and twitch following severe facial trauma in January. Plaintiff reported he had received a CT scan after the attack, but defendant FISK could not find a record of the scan in plaintiff's medical records. Plaintiff reported no change in vision, but complained he was irritated by the constant facial twitching and had noticed the musculature had begun to change on the left side of his face, "drawing up." Defendant FISK observed plaintiff had an obvious involuntary twitch involving the entire left cheek and eye, occurring many times per minute. She also noted he was neurologically intact, including sensation and muscle strength against resistance, and his extra-occular movement was intact. She noted there was minimal tenderness with deep palpation over the left zygomatic arch. [MR at 5]

Defendant FISK diagnosed facial neuropathy and prescribed Nortriptyline nightly. She also requested plaintiff's medical records, specifically, his CT results and planned to follow-up if there was no improvement. [MR at 5] Plaintiff says defendant FISK told him it would take about three months to obtain his previous medical records and that he would be scheduled a follow-up appointment in three months to see if the nortriptyline was effective.

Plaintiff alleges he was seen by a Ms. Raven, a medical records employee, on May 31, 2011 and was told they couldn't identify the hospital in Huntsville where he was taken after the assault.

Although the medical records provided with the *Martinez* Report do not show any additional sick call requests, plaintiff says he submitted one on June 9, 2011, and another on

July 26, 2011, complaining the nortriptyline was ineffective. He also filed a step 1 and then a step 2 grievance.

On August 11, 2011, plaintiff was transferred from the Dalhart Unit to the Daniel Unit.

**THE LAW AND ANALYSIS**

Deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under Title 42, United States Codes section 1983. *Estelle v. Gamble*, 429 U.S. 97, 105-07, 97 S.Ct. 285, 291-93, 50 L.Ed.2d 251 (1976). Deliberate indifference is defined as a failure to act where prison officials have knowledge of a substantial risk of serious harm to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994). However, not every claim of inadequate or improper medical treatment is a violation of the Constitution, *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); nor does a disagreement with a doctor over the method and result of medical treatment require a finding of deliberate indifference, *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985). Merely alleging that a prison doctor should have undertaken additional diagnostic measures or utilized an alternative method of treatment does not elevate a claim to constitutional dimension, *Varnado v. Collins*, 920 F.2d 320, 321 (5th Cir. 1991), and "negligent medical care does not constitute a valid section 1983 claim," *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Further, medical records showing sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).

Moreover, a delay which does not aggravate or exacerbate the medical condition does not constitute a constitutional violation. *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988). A delay in medical care to a prisoner can constitute an Eighth Amendment violation only if there

has been deliberate indifference, which results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Plaintiff is clearly dissatisfied with the medical care he received from defendant FISK at the Dalhart Unit. Plaintiff's dissatisfaction, however, does not state a constitutional deprivation. The facts alleged by plaintiff and the treatment reflected in the medical records produced with the *Martinez* Report simply do not support a claim of deliberate indifference. Instead, the records and plaintiff's own account show he received an x-ray and two CT scans on the day of the injury. The CT scans included both his facial sinus area and his brain. Nothing in those scans indicated a need for additional treatment. Although plaintiff complained to a Dr. Valdenebro at the Byrd Unit, he was merely told it was too early to know if there was any permanent damage. Doctor Valdenebro did not recommend additional treatment, but merely suggested that plaintiff submit a sick call at his new unit of permanent assignment in about three weeks. When plaintiff arrived at Dalhart and saw defendant FISK, her response was that nerve damage was not treatable and there was no doctor at the Dalhart Unit for him to see. While plaintiff may feel defendant FISK should have done more or should have referred him to a specialist, nothing in the record or in his recitation of facts indicates she knew he was in substantial risk of serious harm or that the failure to make such a referral would create a substantial risk of such harm. Instead, FISK made it clear to plaintiff that she felt the only available treatment would carry a serious risk of disfigurement. As long as medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. *See Youngberg v. Romeo,* 457 U.S. 307, 322-23, 102 S.Ct. 2452, 2461-62, 73 L.Ed.2d 28 (1982). A prisoner's, or some other layperson's, disagreement with prison officials regarding medical treatment is insufficient to establish an

unconstitutional denial of medical care. *Norton v. Dimanzana*, 122 F.3d 286, 292 (5th Cir. 1997).

Plaintiff's disagreement with defendant FISK's medical judgment is not sufficient to support a claim of deliberate indifference. More importantly, even if defendant FISK had been mistaken in her evaluation of plaintiff, any mistaken judgment would support, at most, a claim of negligence, if even that. "[N]egligent medical care does not constitute a valid section 1983 claim." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

To the extent plaintiff complains about being required to submit three nurse sick call requests in May 2011 before he was allowed to see defendant FISK again, this "gatekeeping" protocol delayed his second visit to P.A. FISK, for at most, eight days. Plaintiff has not identified any harm caused by that delay. Therefore, this delay will not support a claim of deliberate indifference.

Lastly, plaintiff's second visit to P.A. FISK on May 19, 2011, resulted in a prescription of Nortriptyline to treat plaintiff's discomfort, facial tick, and the drawing of his muscle. A follow-up visit was to be made in three months to evaluate the effectiveness of the Nortriptyline. The records from plaintiff's CT scans were also requested. Again, while plaintiff is clearly dissatisfied with the treatment of Nortriptyline and feels something more should have been done, the treatment represented an exercise of medical judgment which the Courts do not second-guess for purposes of Eighth Amendment analysis. To the extent plaintiff is dissatisfied with the difficulties prison officials had in identifying the hospital in Huntsville where he was treated and where the CT scans were performed, and in locating his records and CT scans from that hospital, plaintiff does not allege defendant FISK was responsible for this delay and has not alleged facts showing it caused him any harm.

## CONCLUSION

In short, "[d]eliberate indifference exists wholly independent of an optimal standard of care." *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006). Plaintiff's dissatisfaction with the care he received from defendant FISK and his assertion that more should have been done to treat his apparent nerve damage does not elevate his claim to one of constitutional dimension. *Varnado v. Collins*, 920 F.2d 320, 321 (5th Cir. 1991).

For the reasons set forth above and pursuant to Title 28, United States Code, section 1915(e)(2) and Title 42, United States Code, section 1997e(c)(1), it is the RECOMMENDATION of the Magistrate Judge to the United States District Judge that the Civil Rights Complaint filed pursuant to Title 42, United States Code, Section 1983, by plaintiff MICHAEL A. BAKER be DISMISSED WITH PREJUDICE AS FRIVOLOUS AND FOR FAILURE TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.

It is the further RECOMMENDATION of the Magistrate Judge to the United States District Judge that the Court decline to exercise pendent jurisdiction over plaintiff's state law tort claims, if any, and that such claims be DISMISSED WITHOUT PREJUDICE.

The United States District Clerk shall mail a copy of this Report and Recommendation to plaintiff and to each attorney of record by first class mail.

IT IS SO RECOMMENDED.

ENTERED THIS 7th DAY OF FEBRUARY, 2014.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).